

**ORDERED in the Southern District of Florida on August 6, 2024.**

_____

**Mindy A. Mora, Judge**
**United States Bankruptcy Court**

---

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
**www.flsb.uscourts.gov**

In re:                                        Case No.: 22-17916-MAM

Raging Bull Investments Limited,              Chapter 11

    Debtor.

_____/

### <u>MEMORANDUM OPINION</u>

This case is difficult on several levels. The major players are insiders of debtor

Raging Bull Investments Limited ("<u>RBIL</u>"), a Texas limited partnership now doing

business in Florida. They are also members of a family unit that dissolved years ago.

The two key witnesses in a two-day trial on multiple issues are former spouses.

During their marriage, Mark Croft and Maureen Croft[1] shared a financial future. In

---

[1] For simplicity and ease of reading, the Court will refer to Mark Croft and Maureen Croft by their given names in the balance of this Opinion. No disrespect is intended or implied.

that time, and with family financial security in mind, they created and funded an investment vehicle, RBIL. Then the marriage ended, and neither spouse invested the time to clearly decide and document an agreement about what should happen to RBIL after the divorce.

Mark and Maureen's post-divorce state of family and business affairs led to attempts in this bankruptcy case to jointly support, then abandon, a global settlement agreement. They each contrived independent attempts to enforce that settlement (announced in detail on the record but never memorialized in writing) and another (properly documented in writing) settlement agreement.[2] The written settlement agreement is silent as to certain key points of contention between the parties.

This decision covers seven related filings in the main bankruptcy case that collectively lead to the conclusion that this chapter 11 case has a very slim chance of survival, and an even slimmer chance of success. The real tragedy is that dismissal, should it occur, probably will not give any party what they desire absent an as-yet undemonstrated ability to cooperate outside of court. And, for the case to remain viable in this Court, appointment of a trustee is the only way to ensure that all creditors, including the couple's two disabled adult children, receive the best possible

---

[2] To be clear, Debtor RBIL (rather than Mark) filed a motion to compel Maureen to comply with the terms of the settlement agreement (ECF No. 117), not Mark, but Mark presently controls RBIL through his asserted control over RBIL's general partner, Raging Bull Management LLC (previously known as Raging Bull, LLC). The Court attributes to Mark the decision by RBIL to file the motion to compel because RBIL did not present evidence of an agreement by other partners to take any particular action in this bankruptcy case.

outcome.

In short, this case presents an array of competing interests and concerns, and none of the options available to the Court are attractive. Forced to choose between unpalatable options and faced with a stark lack of reliable evidence, the Court decides this matter focused on what is in the best interests of all creditors first, then RBIL's continued viability as a business entity second, and equity ownership's desires last.

## THE FILINGS

This decision covers seven filings (the "Filings") in Debtor RBIL's main bankruptcy case. Because the arguments and issues overlap, reference to motions and objections in this Opinion would be confusing without a roadmap. The Court provides one here in table format:

| ECF No. | Abbreviated Name | Premise |
|---|---|---|
| 38 | RBIL's Objection | RBIL's objection to Maureen's proof of claim (POC No. 2) |
| 46 | Maureen's Objection | Maureen's objection to Mark's scheduled claim(s) |
| 54 | Stay Relief Motion[3] | Maureen's motion seeking stay relief to continue litigation against Mark in Texas state court |
| 112 | Appointment Motion | Maureen's motion seeking the appointment of a trustee for RBIL |
| 117 | RBIL's Enforcement Motion | RBIL's motion to enforce a court-approved settlement agreement against Maureen |
| 216 | Mark's Sanctions Motion | Mark's motion for sanctions against Maureen |

---

[3] The Court previously issued an order denying the portion of the Stay Relief Motion that sought dismissal.

3

| 225 | Maureen's Enforcement Motion | Maureen's motion to enforce the same court-approved settlement agreement against Mark |

Listing the filings makes one thing clear: Mark and Maureen each seek control over RBIL's money. The process by which each person, in their capacity as a limited partner of RBIL, has operated does not change the fundamental truth that, in the end, Mark and Maureen are fighting for control over what used to be a marital asset. Complicating this situation are two important points: 1) Mark and Maureen's Final Decree of Divorce ("Divorce Decree")[4] does not clearly describe who should assume control over RBIL and receive future distributions from RBIL, and 2) Mark and Maureen's adult children, Anthony Croft and Carl Croft, both of whom are disabled, allegedly might have possessed equity interests in RBIL as of the Petition Date (October 12, 2022).

Mark and Maureen agree that Anthony and Carl derive present benefit from guidance and care over medical matters, but bitterly disagree about whether custodial arrangements drafted when Anthony and Carl were minor children should impact whether Anthony and Carl own any interest in RBIL as legal adults. The Court has no reliable evidence regarding Anthony's and Carl's wishes, nor any reliable documentary evidence regarding issuance of equity interests to them or for their benefit.[5] While Mark and Maureen dicker over who should do what, where, how,

---

[4] ECF No. 241-6.

[5] Anthony and Carl have not retained independent counsel to represent their interests in this bankruptcy case. Neither Mark nor Maureen arranged for independent counsel on their behalf. It is

and why regarding disposition of RBIL's bankruptcy estate, Anthony and Carl remain caught in the crossfire, unrepresented and likely uninformed.

Nothing about this bankruptcy case is simple.

## BACKGROUND

RBIL came into existence during Mark and Maureen's marriage. Testimony from the former spouses at trial often conflicted, and neither witness was more credible than the other. Both agreed, however, that RBIL started as an investment vehicle, and that neither spouse paid it much attention at the time of formation. It was, essentially, a "wish" entity designed to hold a speculative investment. That investment was land that might, just might, provide access to oil and gas someday. As luck would have it, many years later, it did just that.

And then the problems started.

Now that the land is capable of producing not just some amount of income, but a handsome dividend, Mark and Maureen are locked in a death struggle to claim control over the proceeds of an oil and gas lease with EOG Resources, Inc. (the "EOG Lease").

A. Facts Supported by the Record

Mark and Maureen both failed to provide the Court with a clear timeline of

_____

unclear from the record whether Anthony and Carl are able to comprehend RBIL's status as a legal entity or bankruptcy debtor.

events. Forced to piece together the history from documents that ranged from public record filings that might be accurate to wholly unreliable drafts with vague handwritten comments like "fix this section", the Court strained to discern which facts were undisputed.[6] This task was much harder than it ought to have been.

From its own research, the Court teased out the following factual information as (mostly) beyond dispute:

- RBIL was formed on or around July 14, 2003.[7]

- Raging Bull LLC (now Raging Bull Management, LLC, or "<u>RBM</u>")[8] is the general partner of RBIL.[9]

- The parties are unable to produce a final, fully executed, written partnership agreement for RBIL.

- Meeting minutes for RBIL dated July 18, 2003 (the "<u>Minutes</u>") describe proportionate splits of partnership interests in RBIL. Only Mark signed the

---

[6] The court's use of the term "might" to describe the validity of public records involving RIBL is not accidental. Although public records are generally accepted as true and accurate, business entities act through individual persons. In this instance, Mark prepared public record filings without securing Maureen's signature as a partner. There is no written partnership agreement providing authority for Mark to do so.

[7] ECF No. 178-1, pdf p. 1.

[8] To avoid over-complicating an already complicated story, the Court will refer to Raging Bull LLC by the acronym of its current name. This nomenclature ("RBM") describes both the old and present forms of the entity formerly known as Raging Bull LCC and now known as Raging Bull Management LLC.

[9] ECF No. 178-1, pdf. p. 2.

Minutes; Maureen did not sign them.[10] Maureen disputes that she waived

corporate formalities for the meeting. Anthony and Carl were minors at

that time.

- The Minutes provide the following allocations of ownership interests:

    o Mark S. Croft 51%
    o Maureen G. Croft 47%
    o Anthony R. Croft 1%
    o Carl H. Croft 1%
    o RBM 1%

- RBIL's bankruptcy filings contradict the division of interests listed above,

  providing a similar, but not identical, tally. The ownership interests

  disclosed in RBIL's bankruptcy are: RBM (1.00%), Mark S. Croft (50.49%),

  Maureen G. Croft (46.53%), Carl H. Croft (0.99%), and Anthony R. Croft

  (0.99%).[11]

- Documents drafted about one week after the Minutes purport to

  memorialize a consulting agreement ("Consulting Agreement") and

  promissory note ("Note") between RBIL and Mark.[12] Only Mark signed the

  Consulting Agreement and Note. Maureen disputes the validity of the

  Consulting Agreement and Note.

---

[10] ECF No. 134-6.

[11] ECF No. 1. Maureen disputes any ownership division that might attribute interests to Antony and Carl.

[12] ECF Nos. 136-4 and 136-5.

- RBIL and RBM did not always follow corporate formalities, including the filing of periodic reports with the state of Texas. The Texas Department of State suspended RBIL's authorization to do business on April 8, 2009.[13] RBIL was reinstated into good standing with the state of Texas after the Petition Date.[14]

- Sometime around the year 2009, Mark suffered a catastrophic accident. After the accident, his sister, Michele Croft, was appointed as a guardian over his personal and financial affairs.

- Mark and Maureen's divorce became final on or around September 2012.

- Michele's guardianship over Mark ended sometime around 2018-2019, and a third party stepped in as a professional guardian to manage Mark's affairs. Mark's guardian authorized payment of expenses on RBIL's behalf during this time.[15]

- RBIL began making money sometime between 2018 and 2020.[16]

- Maureen unilaterally assigned a one-half interest in RBIL's primary asset (the EOG Lease) to herself on April 1, 2022. Maureen did not provide the Court with authenticated documents evidencing her authorization to take

---

[13] ECF 178-1, pdf pp. 3 and 8.

[14] ECF Nos. 135-11 and 135-12.

[15] ECF No. 134-16 at pdf pp. 7 (¶ 8B) and 10 (¶ 14).

[16] The specific date is unclear from the record.

this action on behalf of RBIL. Mark characterized this action as a fraudulent transfer. Under his direction, RBIL filed an adversary proceeding against Maureen seeking recovery of any interest in the EOG Lease held by Maureen (the "<u>Disputed Lease Interest</u>") as a result of the disputed assignment.

- Mark and Maureen entered into a settlement agreement (the "<u>Settlement Agreement</u>") earlier in this bankruptcy case to resolve key issues between the parties, including allegations of fraudulent transfer. The Settlement Agreement included provisions that required Maureen to reconvey the Disputed Lease Interest back to RBIL, and RBIL's execution of documents necessary to support distributions of funds.[17]

- The Court approved the Settlement Agreement (ECF No. 39) (the "<u>Settlement Order</u>") on February 2, 2023. The Settlement Order is now final and non-appealable.

- Both Mark and Maureen contended that the Settlement Agreement should be enforced but, as of the date of trial, remained deadlocked regarding whether Anthony and Carl have interests in RBIL and, if so, how those interests should be managed. Maureen expressed concern that any ownership interest held by Anthony and Carl in their own names might

---

[17] ECF No. 37, pdf pp. 7, ¶¶ 1 & 3.

impact government benefits. For his part, Mark was unwilling to transfer management or ownership of Anthony's and Carl's interests to Maureen without clear evidence that Anthony and Carl, not Maureen, would be the ultimate beneficiaries of Anthony and Carl's percentage interest in RBIL's future income.

- At a hearing before this Court on October 24, 2023, Mark and Maureen informed the Court that they had reached a global resolution (the "Global Settlement") of all pending issues in this bankruptcy case. Both parties indicated their affirmative consent to the Global Settlement on the record, describing the terms in detail. The Global Settlement included the following terms:

  o RBIL will formulate a consensual chapter 11 plan (the "Plan") which will provide for the split of RBIL's pre-petition and post-petition oil and gas revenue 51% to Mark and 49% to Maureen, with respect to all revenues received through the date of confirmation of the plan.
  o The Plan will provide for the division of RBIL's remaining asset, namely, the EOG Lease, into separate interests with 49% being assigned to Maureen and 51% being assigned to Mark, free and clear of all liens, claims and encumbrances.
  o Maureen and Mark will execute an assignment of the EOG Lease providing for those assignments and record it in Loving County, Texas, within thirty days of confirmation of the consensual liquidating plan.
  o An agreed confirmation order will direct EOG to disburse any funds it is holding or receives on RBIL's behalf according to this division.
  o Mark and Maureen will pay all administrative expenses up to $163,000 following the same division (51% paid by Mark and 49% paid by Maureen).
  o Administrative expenses exceeding $163,000 and up to $201,000 will be paid 75% by Mark and 25% by Maureen.

- o Mark will pay all administrative expenses exceeding $201,000.
- o Mark and Maureen will exchange mutual general releases under the Plan solely with respect to RBIL, RBM, the EOG Lease and the revenues generated from it, and the Disputed Lease Interest. The release will not relate to any claims arising from the Divorce Decree.
- o Maureen will be responsible for handling objections to claims in this bankruptcy case. To the extent any claims against RBIL are not disallowed, the liability for such claims will be split, with Maureen being responsible for 49% of such claims and Mark being responsible for 51% of such claims.
- o If there are insufficient funds on hand in the RBIL account to pay amounts due to Maureen according to the terms of this settlement, then the amount of the shortfall will be paid by Mark.

B. <u>Prior Rulings and Case Status</u>

Although the parties sought and consented to entry of the Settlement Order within a few months of the Petition Date, their ability to cooperate quickly disintegrated. The parties engaged in a judicial settlement conference ("<u>JSC</u>") over a period of months, ultimately arriving at the Global Settlement.

While the parties continued pursuit of the JSC, RBIL filed a plan and disclosure statement (ECF Nos. 94 and 95). Based upon the eventual success of the JSC, RBIL petitioned the Court for permission to file an amended plan and disclosure statement, which the Court granted (ECF No. 199). At that time, the parties represented that the amended plan would memorialize the Global Settlement between the parties and resolve points of dispute previously set for an evidentiary hearing.

At a status conference held on January 11, 2024, the parties represented that, once again, they had reached an impasse that prevented the submission of an

11

amended plan incorporating the Global Settlement. Specifically, Mark contended that Maureen had misled him and the Court about her ability to function as a legal guardian for Anthony's and Carl's financial interests. Moreover, Mark stated it would be a breach of his fiduciary duty as manager of RBIL's general partner to disburse to Maureen 49% of the revenue from and interests in the EOG Lease, because he believed that at least .99% of that revenue and those interests each belong to Anthony and Carl. Maureen pointed out that she has been the primary caretaker of their children since their divorce, has maintained responsibility for paying their expenses even after the age of legal adulthood, and remains concerned that any interests or funds transferred directly to Anthony and Carl would adversely affect their entitlement to government benefits.

The Court scheduled the bankruptcy case for an evidentiary hearing on February 22 and 23, 2024 (the "Trial"). Immediately prior to the Trial, the Court issued a memorandum order (ECF No. 240) (the "Dismissal Order") denying the Stay Relief Motion to the extent that it alternatively sought dismissal of RBIL's bankruptcy case. The portion of the Stay Relief Motion seeking stay relief remains pending.

At the Trial, the Court took evidence upon all seven Filings identified in this Opinion, which includes two motions (ECF Nos. 216 and 225) filed after entry of the order setting the Trial (ECF No. 214). While this Opinion remained under advisement, Maureen filed yet another motion seeking appointment of a chapter 11

trustee (ECF No. 263) (the "Expedited Motion"). In the Expedited Motion, Maureen alleges that Mark received distributions on behalf of RBIL and failed to provide the Court with adequate monthly reporting of such income.

At a hearing on June 28, 2024 (the "June 28 Hearing"), RBIL's counsel provided a plausible explanation for any discrepancy between actual receipt, reported receipts, and perception. Because all parties, including the United States Trustee, had very little time to meaningfully respond to the Expedited Motion, the Court continued the matter to July 30, 2024 (the "July 30 Hearing") to permit comprehensive disclosure and review of documents. At the July 30 Hearing, the Court continued the Expedited Motion to August 27, 2024 to allow the United States Trustee sufficient time to conclude its investigation.

As of the date of entry of this Opinion, RBIL has not yet filed an amended plan or disclosure statement.

## ANALYSIS

This bankruptcy case presents multiple overlapping issues that are difficult to address in a simple, direct fashion. The analysis for one filing carries over to the next, and the undisputed facts are, as set forth above, limited. Although presentation of evidence at trial typically provides a reasonable foundation for the Court to make factual determinations, this Trial did the opposite. For every fact stated by one witness, the other presented an opposing view. And, unfortunately, neither witness was more credible than the other.

13

To provide the parties with a ruling, the Court dug deep into the record to determine which facts were supported with more than merely testimonial evidence. Even so, the Court ran into roadblocks. Much of what was filed in this bankruptcy case and in the public business entities records in Texas originated at Mark's direction. Because Mark did not obtain signatures from another limited partner (namely Maureen) approving the Minutes, Note, Consulting Agreement, or any of the subsequent public filings, the documents are of debatable value. Maureen's testimony that she was not consulted about partnership decisions, including the split of ownership interests, seems plausible for the most part—but even that assumption is suspect as the Court recognizes that memories fade over time.

Mark and Maureen presented conflicting (and occasionally combative) testimony about events that happened approximately 20 years ago. The lifetime of events that have transpired since they were married appear to have colored their viewpoints, with each of them becoming more entrenched in their own viewpoint. The Court acknowledges that each witness likely believed his or her version of facts. The Court is also aware that the truth probably lies somewhere in between.

The Court must observe once more that the absence of a formal (and final) partnership agreement is problematic. Had that document existed, it might have provided a reasonable basis upon which to make other logical assumptions. But the parties were unable to provide the Court with a final partnership agreement, and instead introduced into evidence only unsigned drafts of a limited partnership

14

agreement with numerous handwritten notes.[18]

Finally, the absence of independent, unemotional representation of Anthony's and Carl's interests created a striking void in the record. The Court does not question that both Maureen and Mark want the best for their children. Still, Anthony and Carl are legal adults, whatever their medical status may be, and neither parent introduced evidence of or testimony from a current court-appointed guardian for Anthony and Carl's legal or financial interests. The absence of reliable evidence demonstrating impartial stewardship of Anthony's and Carl's alleged ownership interests in RBIL caused the Court great consternation.

The balance of this Opinion addresses each of the seven Filings in numerical order, with the exception of the two enforcement motions, which are treated together.

A. RBIL's Objection (ECF No. 38)

RBIL objected to Maureen's proof of claim (POC No. 2) on the basis that Maureen's transfer of the EOG Lease to herself was an *ultra vires* act. Because Maureen failed to provide the Court with written authorization for her unilateral transfer and no written partnership agreement supports her actions, the Court agrees. The Court also notes that the Settlement Agreement unambiguously required Maureen to restore RBIL's ownership of the EOG Lease.[19] Representations on the

---

[18] ECF No. 137-10.

[19] The Settlement Order is final and non-appealable.

15

record at the June 24 Hearing indicate that Maureen has transferred the interest back to RBIL in compliance with the Settlement Agreement.

Having reviewed all available evidence, the Court concludes that Maureen is entitled to her equity interest in RBIL's assets to the extent of her ownership percentage in RBIL, after payment of RBIL's legitimate claims and expenses. The Court will address determination of the size and amount of that interest later in this Opinion.

B. Maureen's Objection (ECF No. 46)

Maureen objected to scheduled claims for Mark on the basis that the claims were unsubstantiated by any valid written documents. Maureen contended that the Note and Consulting Agreement were either forged or, alternatively, executed without Maureen's approval. Maureen also objected to payment for any services rendered by Mark under the Consulting Agreement prior to 2018 because RBIL was not producing income, which Maureen contended made Mark's agreement to provide services illusory. *C.f. Henry & Sons Constr. Co. v. Campos*, 510 S.W.3d 689, 693 (Tex. App. 2016) (discussing illusory contracts).

To the extent that Mark retained the ability to deny or immediately discontinue future consulting services to RBIL based upon RBIL's inability to pay, Maureen would be correct. *Id.* Likewise, RBIL's promise to pay Mark only upon the occurrence of future uncertain events (discovery of oil and gas access) indicates that the Consulting Agreement and Note might lack adequate consideration on both sides.

16

*Id. But see Ophthalmic Consultants of Texas, P.A. v. Morales,* No. 13-15-00278-CV, 2015 WL 6119490, at *3 (Tex. App. Oct. 15, 2015) (reciprocal binding promises were adequate consideration). Fortunately, the Court need not dig so deep in its analysis because other equitable principles govern this situation.

At trial, Maureen did not produce sufficient evidence of forgery of the Note, Consulting Agreement, Minutes, or other documents purporting to (i) obligate RBIL to Mark, or (ii) establish Mark as the majority owner with authorization to manage RBIL. Instead, she testified as to her lack of recollection regarding acquiescence to the execution of these documents. Her testimony regarding RBIL's actions and ownership declarations from about twenty years ago was not entirely credible but, then again, neither was Mark's.

Without reliable witness testimony, the Court focused upon the written record. Much as the Court would have liked to base its ruling upon legitimate and final partnership documents, the lack of a final written partnership agreement signed by all parties made this impossible. Instead, the Court was left with a classic "he said, she said" scenario, and documents of questionable provenance. Those documents included public filings (signed only by Mark) and other documents, including the Note, Consulting Agreement, and Minutes (also signed only by Mark).

In the absence of reliable evidence to the contrary, the Court concludes that RBIL's entry into the Note and Consulting Agreement were *ultra vires* acts advanced by Mark as a self-interested limited partner of RBIL and as a self-interested

17

member/manager of RBM. *C.f. Osborne v. Lesko (In re Villas of Windmill Point II Prop. Owners Assn.)*, 2021 WL 1711794, at *7 (Bankr. S.D. Fla. April 29, 2021) (concluding that transaction where director of HOA failed to secure signatures from disinterested board members was *ultra vires* action). Lack of ratification by any other partner who was not self-interested renders the Note and Consulting Agreement unenforceable against RBM, RBIL, and RBIL's other limited partner(s). *Id.* Any other conclusion under similar circumstances would invite malfeasance by one self-interested partner at the expense of all other general and limited partners.

The Court concludes that Mark's scheduled claims should be limited to his equity interest in RBIL's assets to the extent of his ownership percentage in RBIL, after payment of RBIL's legitimate claims and expenses. The Court will address determination of the size and amount of that interest later in this Opinion.

C.  Stay Relief Motion (ECF No. 54)

Section 362 of the Bankruptcy Code provides for an automatic stay of all proceedings against a debtor. Subsection 362(d) allows bankruptcy courts to grant relief from the automatic stay for "cause," which is undefined in the Bankruptcy Code. *The Disciplinary Board of the Supreme Court of Penn. v. Feingold (In re Feingold)*, 730 F.3d 1268, 1276-77 (11th Cir. 2013).

The decision to grant stay relief is at its core an equitable one, rooted in fundamental public policies supporting bankruptcy relief. *See generally Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 363-64 (2006) (discussing critical functions

18

of bankruptcy court); *State of Fla. Dept. of Revenue v. Diaz (In re Diaz)*, 647 F.3d 1073, 1084 (11th Cir. 2011) (citing same). In making the determination of whether stay relief is appropriate under § 362(d)(1), bankruptcy courts may look beyond the enumerated statutory exceptions provided by § 362(b) to consider the totality of the circumstances potentially constituting "cause", with the conclusion ultimately resting upon the discretion of the bankruptcy court as the finder of fact. *Feingold*, 730 F.3d at 1276-77.

The Court previously denied Maureen's request for dismissal included in the Stay Relief Motion for the reasons stated in the Dismissal Order. Stay relief is also inappropriate because the Court perceives that greater needs are at play here. The debtor, RBIL, is before this Court, not Mark and Maureen individually. That distinction is the guiding principle underpinning the Court's analysis.

The Court acknowledges that the Texas state court was, at the time of Mark and Maureen's divorce, best suited to determine the division of marital assets between Mark and Maureen. Unfortunately, the Divorce Decree fails to clearly articulate who retained ownership and/or control over RBIL after the divorce.

Mark and Maureen were married in Texas, lived as a married couple in Texas, and the District Court of Harris County, Texas issued the Divorce Decree.[20] That was almost 12 years ago, however, and much has changed since then. Mark now lives in

---

[20] ECF No. 241-6.

Florida, and has relocated RBIL's principal place of business to this state. That change in status weighs in favor of this Court retaining jurisdiction over RBIL's bankruptcy estate.

That determination carries us to the next consideration impacting the availability of stay relief as an equitable remedy, which is that any litigation regarding the division of marital assets between Maureen and Mark is not the same as litigation involving RBIL as a business entity. Maureen's proposed petition for asset division in the Texas state court is against Mark individually, not RBIL.

Because Mark and Maureen's status as former spouses gave rise to their roles as limited partners of RBIL, and RBIL is the asset in question, it is perhaps easy to lose sight of which person or entity would be the defendant. Litigation between Maureen and Mark about division of marital assets, however, is not equivalent to litigation against RBIL itself. The Court is only concerned with RBIL's status as a business debtor, not litigation between Mark and Maureen individually.

RBIL's bankruptcy case cannot move forward without some resolution of who holds ownership interests and in what proportion. Mark and Maureen have not yet demonstrated an ability in this bankruptcy case to set their personal acrimony aside and work together consensually for not only their own benefit but, more importantly, for the benefit of RBIL.

With the limited partners at an impasse, and lacking a final partnership agreement, RBIL is in dire straits regardless of any financial difficulties it might face.

20

Financial rehabilitation cannot cure the dissent from within. Successfully navigating the initial hurdle of confirmation will not provide a reasonable path forward towards continued economic viability if the primary limited partners of the entity cannot agree to fundamental business strategies on a daily basis.

At this point, the only path forward for this business debtor is a resolution of who owns what. That is the determination from which all other decisions must follow.

The Global Settlement provides a consensual and sensible resolution of the appropriate division of partnership interests outside of court and eliminates the need for litigation in Texas. With that resolution, RBIL can file an appropriate amended liquidating plan and proceed to confirmation. The Court therefore will enforce the Global Settlement as binding, as explained in greater detail below.

The next issue is more fundamental: even if the parties' prior agreement to a consensual resolution of ownership interests (i.e., the Global Settlement) is enforced, how can RBIL function as a business entity through the remainder of its bankruptcy journey? What evidence does the Court have of competent and clear-minded direction, free from the taint of partner self-interest?

D. Appointment Motion (ECF No. 112)

It is rare for a court to appoint a chapter 11 trustee. *In re Sundale, Ltd.*, 400 B.R. 890, 899–900 (Bankr. S.D. Fla. 2009) (citing *In re SunCruz Casinos, LLC*, 298 B.R. 821, 828 (Bankr. S.D. Fla. 2003). Bankruptcy courts typically begin each chapter 11 bankruptcy case presuming that the debtor in possession (or its existing

management, in the case of a business entity) has the most in-depth and accurate knowledge of the debtor's business affairs. 400 B.R. at 899. A court may set aside this presumption, however, in favor of equitable concerns when circumstances indicate that the best interests of the debtor and all creditors are in jeopardy. 11 U.S.C. § 1104(a).[21]

Section 1104(a)(1) of the Bankruptcy Code permits appointment of a trustee for cause, including situations involving fraud, dishonesty, incompetence, or gross mismanagement of the debtor by current management before or after the petition date. As with most references in the Bankruptcy Code to "cause", the term may expand to include situations beyond those listed in the statute. *Sundale*, 400 B.R. at 900 (listing § 1104(a)(1) factors and noting discretion of court); *Climate Control,* 585 B.R. at 200 (determination of cause is on a case-by-case basis). The primary focus of the court's investigation under § 1104(a)(1) is whether harm to the debtor itself has occurred and may continue if left unchecked.

Section 1104(a)(2) has a slightly different focus. It provides for the appointment of a trustee "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." For this subsection, a court evaluates the potential for harm to creditors and interest holders, not just the debtor

---

[21] Most courts apply a clear and convincing standard to 11 U.S.C. § 1104(a) analysis. *In re Climate Control Mech. Servs., Inc.*, 585 B.R. 192, 200 (Bankr. M.D. Fla. 2018) (citing *Sundale* and *In re G-I Holdings, Inc.,* 385 F.3d 313, 318 (3d Cir. 2004)).

itself. *Sundale*, 400 B.R. at 900 (listing § 1104(a)(2) factors); *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006) (discussing analysis of advantages and disadvantages, flexibility of standard, and invocation of broad equitable powers).

Under both § 1104(a)(1) and (2), the decision to appoint a trustee is fact intensive. *Sundale, 400 B.R.* at 900. Courts approach each appointment on a case-by-case basis applying a totality of the circumstances approach. *Id.* The primary difference between the two subsections, beyond the focus of the initial inquiry, is the breadth of the court's discretion. While § 1104(a)(1) requires appointment of a chapter 11 trustee upon a finding of "cause", subsection (a)(2) affords the court greater leeway to evaluate the need for independent management. *Id.* at 900-01. If existing issues threaten to undermine the debtor's chance for a successful financial rehabilitation or negatively impact all parties in interest, appointment may be appropriate under subsection (a)(2) even without a specific finding of "cause". *Id.*

Appointment of a trustee is the preferred option for expediting resolution of this bankruptcy case, and it is appropriate under 11 U.S.C. § 1104(a)(1) and (2). Mark acted in his own self-interest in executing the Note and Consulting Agreement. His failure to obtain his then-wife's signature on what likely seemed to be routine documents at the time of execution has been compounded over time. Since the filing of this bankruptcy case, Mark has advanced RBIL's business formalities when it suited his personal interests to do so, but failed to act in RBIL's best interests when those interests did not align with his own. Mark's decision to walk away (or attempt

to do so) from the Global Settlement also indicates that he is still unable to neutrally make decisions in RBIL's (and RBIL's creditors') best interests and the interests of its equity holders.

Similarly, Mark failed to keep a close eye on RBIL's mail, which meant that several business checks failed to be timely deposited. Although the Court has not taken evidence on this point, the Court accepts counsel's representation that Mark unintentionally erred in monitoring his mail and the checks were not deposited due to a miscommunication with his sister, Michelle. Even so, Mark's repeated errors in judgment demonstrate to this Court an ongoing pattern of malfeasance and mismanagement.

RBIL's halting journey through chapter 11 is another concern. Absent competent and unbiased leadership, RBIL simply cannot hope to successfully emerge from chapter 11. Indeed, the Global Settlement contemplated the liquidation of RBIL through confirmation of a liquidating plan. This case is perilously close to conversion or dismissal. Should that occur, it seems likely that all interested parties will suffer even greater losses than they have at present. To stave off conversion or dismissal, RBIL must, at a minimum, file a liquidating plan within the next 60 days and proceed expeditiously to confirmation. At this juncture, the Court believes that this task will be impossible absent the appointment of an independent chapter 11 trustee.

RBIL continues to suffer in a paralytic state largely due to the parties' inability to memorialize the Global Settlement's amicable division of ownership interests in

24

RBIL. This bankruptcy case has stalled out several times due to the parties' mutual inability to work together, and it seems likely to do so again. The Court will grant the Appointment Motion to ensure that RBIL's bankruptcy case has the greatest possible chance of resolution.

RBIL's schedules and statements of financial affairs describe Mark as the majority interest holder of RBIL and sole interest holder of RBM. The Global Settlement preserves Mark's status as the majority interest holder of RBIL by dividing the ownership interests 51% in favor of Mark and 49% in favor of Maureen. Appointment of a chapter 11 trustee will not alter that division of interests, but it will ensure that RBIL, a business entity, is shepherded through the remainder of the chapter 11 process without *ultra vires* acts and self-dealing.

E. RBIL's Enforcement Motion (ECF No. 117) and Maureen's Enforcement Motion (ECF No. 225)

The Settlement Order is final and non-appealable. Paragraph 1 of the Settlement Agreement provided as follows:

> Defendant, Maureen G. Croft ("Defendant") will prepare a reconveyance of Primary Asset (as defined in the Complaint filed in this action) in a form acceptable to the Debtor, Raging Bull Investments Limited ("Plaintiff") to the Plaintiff, and record such reconveyance in the Public Records, Loving County, TX as soon as practicable. The Debtor and Mark Croft agree to cooperate with the reconveyance and sign any document necessary to complete the reconveyance and for the Debtor to receive the income of the Primary Asset

Representations by counsel at the June 28 Hearing indicated that Maureen prepared and executed a reconveyance of the Disputed Lease Interest (defined in the

25

Settlement Agreement as the "Primary Asset") to RBIL. The terms of the Settlement

Agreement are unambiguous as to her agreement to do so, and her compliance

renders RBIL's Enforcement Motion moot.

Paragraph 3 of the Settlement Agreement further provides as follows:

> The Debtor shall coordinate with EOG Resources, Inc. to have the
> Primary Asset placed back in pay status. The Debtor shall execute
> Division Orders and other similar documents reasonably requested by
> EOG Resources or any production purchasers to accomplish this
> purpose. The Debtor will pay monthly JIBs from, and accept revenues
> into the debtor-in-possession account. Such funds shall not be
> distributed to Mark Croft or Maureen Croft without further order of the
> Bankruptcy Court.

This Court concludes that Mark and Maureen shared the authority to ensure

RIBL's compliance with paragraph 3 of the Settlement Agreement following

Maureen's reconveyance, and now directs both Mark and Maureen to work with the

chapter 11 trustee, upon the trustee's appointment by the office of the U.S. Trustee,

to ensure that paragraph 3 of the Settlement Agreement is performed in all respects.

The Court now turns to the Global Settlement and the parties' respective

positions on proceeding with that arrangement. The Global Settlement was a

negotiated sensible resolution of the years of bickering that Mark and Maureen have

engaged in regarding RBIL. The inability of RBIL, under Mark's direction, to

consummate that settlement arose from Mark's concern that the equitable interests

of Anthony and Carl in RBIL were being ignored.

The Court finds this position untenable, for a number of reasons. First, there

was a dearth of proof regarding who held an equitable interest in RBIL at its formation. There is no written final limited partnership agreement, and the documents produced by Mark purporting to show who the equity holders were at formation were all prepared by Mark. Maureen repudiated their authenticity, claiming that she would never have consented to their execution because Anthony and Carl's direct ownership of RBIL limited partnership interests would negatively impact their government benefits. Having reviewed the full record, the Court determines that there is insufficient proof in this bankruptcy case that Anthony and Carl were ever issued or presently hold an interest in RBIL.

Second, Mark did not dispute Maureen's testimony regarding her continued daily care of Anthony and Carl, despite their status as legal adults. That testimony included representations that she still serves as their financial guardian.[22] To the extent that Mark has any concern about any alleged interests that Anthony and Carl might have in RBIL being squandered, the Court believes that Maureen has sufficiently demonstrated her commitment to care for Anthnoy and Carl and see to their needs.

Third, the Court notes that the creditor matrix in this case included notice to Anthony and Carl care of Judge Jason Cox at Probate Court No. 3 in Houston, Texas.

---

[22] It is unclear from the record whether Maureen presently functions as a court-appointed or court-approved legal and financial guardian.

According to Mark's testimony, Judge Cox presides over matters relating to a trust established for Anthony's and Carl's needs.[23] To date, no court-approved guardian, counsel, or other formal legal representative has appeared in this bankruptcy case to represent Anthony's and Carl's interests despite notice of critical evidentiary hearings having been sent to Judge Cox. In the absence of any credible evidence to the contrary, the Court presumes that any court-approved guardian believes that Anthony and Carl do not hold interests in RBIL.

In the end, this Court is left with an investment vehicle that was established during a marriage that ended in divorce. The Divorce Decree fails to identify RBIL as an asset of the marriage that was to be divided between Mark and Maureen. The Global Settlement, however, fairly divides the interests in RBIL between Mark and Maureen in a manner that appears fair and equitable.

Accordingly, the Court grants Maureen's Enforcement Motion to the extent that it seeks to enforce the Global Settlement, provided however that any actions to be undertaken by RBIL will be done under the direction of the chapter 11 trustee, as

---

[23] *See* Creditor Matrix on CMECF (Label Matrix for local noticing 113C-9):

Anthony Croft
c/o Judge Jason Cox
Probate Court No. 3
201 Caroline St, Houston, TX 77002

Carl Croft
c/o Judge Jason Cox
Probate Court No. 3
201 Caroline St, Houston, TX 77002

more fully explained below.

F.  <u>Mark's Sanctions Motion (ECF No. 216)</u>

Mark's Sanctions Motion demonstrates the confusion and mistrust Mark and Maureen have long harbored against one another. Despite having agreed in principle to a resolution that would allow funds to begin flowing into RBIL and for RBIL's ongoing expenses to be paid, Mark and Maureen hit a wall when it came time to create a confirmable consensual plan, apparently because Anthony's and Carl's interests were undefined and unrepresented in this bankruptcy case. The Court cannot change this circumstance; it can only observe the difficulties that arose because of it.

Mark's primary basis for sanctions is his perception that Maureen intentionally misled him (and the Court) in her negotiation of the Global Settlement by stating that she had authority to represent Anthony's and Carl's interests.[24] Mark contends that Maureen did not have authority to compromise those interests, while Maureen contends that she did.

At trial, Maureen voiced her conviction that the Divorce Decree continues to provide her with guardianship status over Anthony and Carl's legal affairs. Maureen

---

[24] The Court questions Mark's basis for rejecting the Global Settlement after announcing his acquiesce to it on the record. As a former transactional attorney at a multi-national law firm, If Mark truly believed Maureen was serving as a trustee for Anthony and Carl's interests, then a more reasonable deal structure for the Global Settlement would have contemplated a 47% equity interest directly to Maureen, plus an additional 1% equity interest to Maureen as trustee for Anthony and an additional 1% equity interest to Maureen as trustee for Carl.

claims that she has always had Anthony's and Carl's best interests at heart, and that her only motive in arguing about RBIL's distributions is ensuring that Anthony and Carl do not lose government benefits by virtue of their beneficial interest in RBIL.

The record of this bankruptcy case, however, reflects that neither parent appears to have placed Anthony and Carl's interests at the forefront of this debate as much as they contend. If they had, Mark and Maureen would have worked together cooperatively to ensure that any alleged interests of their sons (Anthony and Carl) in RBIL were transferred to a trust in a manner that would not impact their government benefits. That approach seems to be what they elected to do with proceeds from a personal injury lawsuit years ago.[25]

In this bankruptcy case, all actors have hit stumbling blocks, and emotions have been charged. It is clear that Mark and Maureen have struggled to remain on good terms after their divorce. It is also clear that no party has conducted himself, herself, or itself with perfect aplomb. Mark's and Maureen's pre-trial failures, though regrettable, do not rise to the level of intentional deceit or abuse of the bankruptcy

---

[25] A lawsuit regarding Mark's injuries from an accident resulted in resulted in damages payable to Anthony and Carl for loss of consortium.

system.

The Court declines to grant the Sanctions Motion.

## <u>ORDER</u>

Accordingly, having carefully considered the Filings, the evidence introduced at Trial, and the entire record of this bankruptcy case, the Court hereby **ORDERS** that:

1. RBIL's Objection (ECF No. 38) is **SUSTAINED** solely as set forth herein. Maureen is entitled to her equity interest in RBIL to the extent of a 49% ownership percentage, after payment of RBIL's legitimate pre-petition and post-petition claims and expenses.

2. Maureen's Objection (ECF No. 46) is **SUSTAINED** solely as set forth herein. Mark's scheduled claim is limited to his equity interest in RBIL to the extent of a 51% ownership percentage, after payment of RBIL's legitimate pre-petition and post-petition claims and expenses.

3. The Stay Relief Motion (ECF No. 54) is **DENIED**.

4. The Appointment Motion (ECF No. 112) is **GRANTED** solely as set forth herein. The office of the United States Trustee is directed to appoint a chapter 11 trustee for RBIL.

5. RBIL's Enforcement Motion (ECF No. 117) is **GRANTED** solely as set forth herein and **DENIED** in all other respects.

6. Mark's Sanctions Motion (ECF No. 216) is **DENIED** for the reasons stated

in this Opinion.

7. Maureen's Enforcement Motion (ECF No. 225) is **GRANTED** solely as set forth herein and **DENIED** in all other respects.

8. The chapter 11 trustee is **DIRECTED** to file on behalf of RBIL an amended plan that incorporates the Global Settlement, on or before October 1, 2024. In enforcing the terms of the Global Settlement, for each instance in which Mark and Maureen are listed as acting on behalf of RBIL, the chapter 11 trustee is directed to act in their place, so that the amended plan provides for the division of assets and objection to claims being handled as set forth on Exhibit A to this Order.

9. The Court retains jurisdiction to enforce the terms of this memorandum opinion and order.

###

Copy furnished to:
All interested parties by the Clerk.

# EXHIBIT A

o   RBIL will formulate a consensual chapter 11 plan (the "Plan") which will provide for the split of RBIL's pre-petition and post-petition oil and gas revenue 51% to Mark and 49% to Maureen, with respect to all revenues received through the date of confirmation of the plan.

o   In determining the split of pre-petition and post-petition oil and gas revenue, the chapter 11 trustee must include a reimbursement to Mark for all valid expenses paid by Mark for the benefit of RBIL from his own personal funds.

o   The Plan will provide for the division of RBIL's remaining asset, namely, the EOG Lease and the proceeds thereof, into separate interests with 49% being assigned to Maureen and 51% being assigned to Mark, free and clear of all liens, claims and encumbrances, except as otherwise provided for herein.

o   The chapter 11 trustee will execute an assignment of the EOG Lease providing for those assignments and record it in Loving County, Texas, within thirty days of the date on which the order confirming the Plan is entered.

o   An agreed confirmation order will direct EOG to disburse any funds it is holding or receives on RBIL's behalf according to this division.

o   The chapter 11 trustee is empowered to seek from Mark and Maureen, or to deduct from estate funds otherwise payable to Mark and Maureen, funds necessary to pay all administrative expenses up to and including $163,000, with 51% to be paid by Mark and 49% to be paid by Maureen).

o   The chapter 11 trustee is empowered to seek from Mark and Maureen, or to deduct from estate funds otherwise payable to Mark and Maureen, funds necessary to pay all administrative expenses exceeding $163,000 and up to and including $201,000 with 75% to be paid by Mark and 25% to be paid by Maureen.

o   The chapter 11 trustee is empowered to seek from Mark, or to deduct from estate funds otherwise payable to Mark, funds necessary to pay all administrative expenses exceeding $201,000.

o   Upon performance of each of their respective obligations under the plan, all claims against Mark or Maureen solely with respect to RBIL, RBM, the EOG Lease and the revenues generated from it, and the Disputed Lease Interest, will be subject to a plan injunction. The injunction will not relate to any claims arising from the Divorce Decree or any other matter unrelated to RBIL, RBM, the EOG Lease and the revenues generated from it, and the Disputed Lease Interest.

o   The chapter 11 trustee, after consultation with Maureen, will be responsible for handling objections to claims in this bankruptcy case. To the extent any claims against RBIL are not disallowed, the liability for such claims will be split, with Maureen being responsible for 49% of such claims and Mark being responsible for 51% of such claims.

33

○ If there are insufficient funds on hand in the RBIL account to pay amounts due to Maureen according to the foregoing terms, then the amount of the shortfall will be due and owing, and must be paid, by Mark.